NATIONAL AMUSEMENTS,
INC., Plaintiff,

v.

TOWN OF DEDHAM, Defendant.

Civ. A. No. 90–10472–Y.

United States District Court,
D. Massachusetts.

Feb. 6, 1994.

1024

Theodore E. Dinsmoor, Finnegan & Stanzler, Ellen L. Janos, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Stuart T. Rossman, Atty. Gen.'s Office, Trial Div., Real Estate Section, Gail E. Glick, U.S. Dept. of Labor, Office of the Sol., Samuel L. Rodriguez, Epstein, Becker & Green, P.C., Boston, MA, for plaintiff.

Joyce F. Frank, Karen V. Kelly, Kopelman and Paige, Boston, MA, for defendant.

### MEMORANDUM AND ORDER

YOUNG, District Judge.

As the eye is the window of the soul, so too are American movies the expression of our collective psyche. Movies inform us about our lives, our history, our cultures, and those of others—and distort all four. *See* George MacDonald Fraser, *The Hollywood History of the World—From One Million Years B.C. to Apocalypse Now* (1988). They make us laugh and cry even as they exalt and cheapen our daily lives. They raise. the most profound questions of our existence yet are but an ephemeral parody of reality. Above all, since the American movie industry is a business—big business—movies must entertain, and "[t]here is no doubt that entertainment ... enjoys First Amendment protection." *Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 578, 97 S.Ct. 2849, 2859, 53 L.Ed.2d 965 (1977). Guarding the frontier of that protection is a perennial task of America's courts. No function could be more vital.

This particular dispute pits a huge cinema complex against a Massachusetts town and requires analysis of some serious constitutional questions. The matter comes before the Court upon the motion of the Town for summary judgment and the essential facts are undisputed.

### UNDISPUTED FACTS

The Plaintiff National Amusements, Inc. ("National") is a corporation organized under the laws of Maryland with its principal place of business located at 200 Elm Street in the Town of Dedham ("the Town"). National owns and operates Showcase Cinemas ("Showcase"), a theater complex consisting of twelve theaters, all of which exhibit first run movies. The Showcase is located on Route 1 in Dedham. In 1978, Showcase commenced the regular exhibition of late evening movies ("late shows") on Friday and Saturday nights. These late shows usually start between 11:30 p.m. and 12:30 a.m. and end between 1:00 a.m. and 2:30 a.m.

At a meeting of the Board of Selectmen (the "Board") for the Town of Dedham on January 12, 1989, a selectwoman voiced her concern about traffic and security problems at the Showcase parking lot and asked for a report from the police department of all incidents at that location for the past three months. A fellow selectman expressed similar concerns at the January 19, 1989 meeting of the Board. Consequently, the Board requested that the management of Showcase come before the Board to discuss the situation.

The Board also placed Article Forty on the Warrant for the annual Town Meeting. As proposed, Article Forty stated:

ARTICLE FORTY: By the Board of Selectmen: To see if the Town will vote to amend Chapter XIII of the Town By-laws by adding the following new section:

Section 42B—No holder of an entertainment license for theatrical exhibition, public show, public amusement, concert, dance or exhibition, pursuant to General Laws Chapter 140, sections 181 and 183A shall conduct business between the hours of 12 midnight and 6:00 a.m.

This By-law shall not apply to the sale of food or alcoholic beverages to be consumed on the premises at which they are sold when such sale is by a licensed common victualler previously engaged in the sale of food to be consumed on the premises.

(National's Ex. 41.)

On January 23, 1989, the Board sent a letter to the Vice–President of Operations of National conveying the Board's concern over problems stemming from the crowds at the late shows and inviting a representative of National to meet with the Board on February 2, 1989 to discuss the matter. A representative of National did meet with the Board on that day. Approximately thirty residents of the Town, some of whom lived in the general vicinity of the theater, were also present at the meeting.

National took the Board's concerns seriously. Immediately after the meeting a representative of National met with the Town's Chief of Police to discuss ways to improve security in and around the theater. Virtually immediately, National set up a plan to increase neighborhood protection on Friday and Saturday nights. In accordance with this plan National privately hired off-duty Dedham Police Officers to patrol the theater and the adjacent community and furnished a vehicle to patrol the Showcase parking lot on Friday and Saturday evenings. Occasionally this vehicle would also patrol the surrounding residential neighborhood as well as the local public transportation stops. This new security plan went into effect on February 10, 1989. In addition to heightened security, National also instituted a program of litter clean-up crews and screen announcements describing alternative auto exits.

Despite National's attempts to address the concerns of the Town, the Town Meeting voted on April 24, 1989, to adopt an amended Article Forty which pushed the closing time back to 12:30 a.m. and expressly exempted late night ballroom dancing from the new By-law. On August 14, 1989, however, the Attorney General of the Commonwealth of Massachusetts declared amended Article Forty unconstitutional on the ground that the proposed By-law, by distinguishing ballroom dancing from other forms of entertainment, and more specifically from other forms of dance, failed the content neutrality test and thus violated the Declaration of Rights of the Constitution of Massachusetts.

Undaunted, the Board proposed a new Article Four on the Town Meeting Warrant for a Special Town Meeting on November 6, 1989. The new Article Four stated:

Article 4: By the Board of Selectmen: To see if the Town will vote to amend Chapter XIII of the Revised By-laws of the Town of Dedham, entitled "Police Regulations" by adding a new section at the end thereof, as follows: Section 57.

Unless otherwise restricted, no holder of a license issued by the Town of Dedham, pursuant to Massachusetts General Laws, Chapter 140, sections 177A, 181, and 183A,[1] shall permit any activity licensed thereunder to be conducted between the hours of 1:00 a.m. and 6:00 a.m.

Recommendation: That it be so voted.

(National's Ex. 44.)

The Dedham Town Meeting duly approved this Article. On February 8, 1990, the Attorney General for the Commonwealth approved Article Four albeit noting expressly that he was unable to make a factual determination as to whether the effect of closing certain licensed establishments between 1:00 a.m. and 6:00 a.m. was substantially related to the Town's proper governmental interests or whether the effect was greater than necessary to protect that governmental interest. Upon the approval of the Attorney General, Article Four (hereafter called "the By-law") took effect twenty days later.

National was ready. It filed suit in this court on the same day. In its complaint National alleged that Article Four violates National's free speech rights under both the United States Constitution and the Massachusetts Declaration of Rights, violates the due process clause in being unfairly vague and ambiguous, and violates the equal pro-

---

1. In general, Mass.Gen.L. ch. 140, §§ 177A, 181, and 183A grant cities and towns the authority to grant and revoke licenses for amusement de- vices, concerts, dances, exhibitions, public shows, and the like.

tection clause in that it unreasonably restricts National's hours of operation while permitting other licensed establishments beyond the reach of Mass.Gen.L. ch. 140, §§ 177A, 181, and 183A—for example, hotel lounges and bars and other forms of licensed entertainment such as cable television—to continue operation after 1:00 a.m. National sought injunctive relief and this Court, as is its wont, consolidated the hearing on National's motion for a preliminary injunction with an immediate trial on the merits. Fed. R.Civ.P. 65(a)(2). Faced by the prospect of a full trial, the Board of Selectmen caved in, stipulating that the By-law would not be enforced with respect to ten of the twelve theaters in the Showcase complex pending the outcome of the instant case.[2] National, for its part, withdrew its motion for preliminary injunctive relief, and both parties successfully sought a continuance on the ground that the case was probably on its way to settlement.

The parties could not, however, reach a settlement. For a time, the Court urged adoption of a statement of agreed facts, *see Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.,* 972 F.2d 426, 429 n. 7 (1st Cir.1992) and *Boston Five Cents Savings Bank v. Secretary of Dep't of Housing and Urban Dev.,* 768 F.2d 5, 11–12 (1st Cir.1985), but, despite efforts toward this end, no agreement as to material facts was reached. As the case dragged on, National evidently began to feel that its position needed bolstering in light of the Town's argument that the By-law is a reasonable, content neutral 'time, place, or manner' restriction. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47,

106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986). In late June and early July, 1993, National secretly engaged a marketing research firm to visually survey the patrons of its evening shows, note their race, and inquire of a representative sampling of late show patrons (without regard to race) why they chose to attend the late show. (National's Ex. 110).[3] This survey—marked confidential and privileged (though it is not)—purports to show that the majority of late show movie viewers are black, and that many late night patrons prefer that time slot. (*Id.*) National now contends, without amending its Complaint, that the survey is evidence that racial animus impelled the Town to enact the By-law. Faced with an ever expanding stain of allegations, escalating defense costs, and no end in sight, the Town did what it could easily have done three years ago to cap its transaction costs—it moved for summary judgment upon the undisputed—albeit now voluminous—record.

## ANALYSIS

The outcome of this aspect of the case turns on the level of judicial scrutiny applied to the By-law.

The Supreme Court has evolved two distinct approaches to the resolution of first amendment claims; the two correspond to the two ways in which government may "abridge" speech. If a government regulation is aimed at the communicative impact of an act, analysis should proceed along what we will call *track one.* On that track, a regulation is **unconstitutional** unless government shows that the message being suppressed poses a "clear and present dan-

---

2. The power of the Board of Selectmen simply to stipulate that they would not enforce a duly-enacted town By-law is unclear. Apparently the Board feared the cost of a major legal confrontation. Viewed from this perspective the Board action is simply a stark example of the situation that today confronts the executive branch of government at the local, state, and national levels. Perennially strapped for cash, with a legislature—here, the Dedham Town Meeting—unwilling to raise taxes, what may be called 'law enforcement triage' necessarily takes place, with the result that only certain laws are enforced and those only to the level of available resources.

3. This secret and invidious survey raises extremely troubling questions concerning the judg-

ment of National and its counsel. One wonders at the feelings of patrons of the Dedham Showcase Cinema during the summer of 1993 had they known they were secretly being counted and categorized based on their race. Indeed, what National did here appears the functional equivalent of noting the race of a customer on a check—a violation of Mass.Gen.L. ch. 93, § 105(b)(5) which implicates Mass.Gen.L. ch. 93A, § 2. Accordingly, the Clerk of Court is directed to send a certified copy of this opinion to the Attorney General of Massachusetts for such further investigation pursuant to Mass. Gen.L. ch. 93A, § 4 as he may deem appropriate.

ger," constitutes a defamatory falsehood, or otherwise falls on the unprotected side of one of the lines the Court has drawn to distinguish those expressive acts privileged by the first amendment from those open to government regulation with only minimal due process scrutiny. If a government regulation is aimed at the noncommunicative impact of an act, its analysis proceeds on what we will call *track two*. On that track, a regulation is **constitutional,** even as applied to expressive conduct, so long as it does not unduly constrict the flow of information and ideas.

Government may be deemed to have "abridged" speech in the first sense, thus triggering track-one analysis, if *on its face* a governmental action is targeted at ideas or information that government seeks to suppress, or if a governmental action neutral on its face was *motivated* by (i.e., would not have occurred but for) an intent to single out constitutionally protected speech for control or penalty. Of course, the target of government action will be instantly recognizable if the government openly admits that its purpose is limiting information or suppressing an idea, but government will ordinarily defend a restriction on free expression by reference to some danger beyond the speech itself— often, by invoking the permissive talisman of "time, place, or manner" regulation.

Laurence H. Tribe, *American Constitutional Law*, 2d ed. (1988) at 791–92, 794 (footnotes omitted, emphasis added).

Regulations focusing on the direct impact of protected speech on its audience are thus **content based.** *Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988). Since they target express language and its frank impact on an audience, content based restrictions face a heavy presumption against constitutionality. Consequently, in order for a state to enforce a content based restriction, it must show that the ordinance serves a compelling state interest and that the restriction is narrowly drawn to meet that end. *Perry Educ. Ass'n.*

*v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

**Content neutral** restrictions, on the other hand, are "those that 'are *justified* without reference to the content of the regulated speech.'" *City of Renton*, 475 U.S. at 48, 106 S.Ct. at 929 (citations omitted) (emphasis in original). Unlike content based restrictions, content neutral restrictions are aimed at the secondary effects of the language. *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293–94, 104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984). In other words, the justification undergirding content neutral restrictions "ha[s] nothing to do with ... speech." *Boos v. Barry*, 485 U.S. at 320, 108 S.Ct. at 1163. Therefore, in order to sustain a regulation that is content neutral the government need only establish that the restriction is a reasonable restraint on the time, place, and manner of such speech and that the law does not unreasonably limit alternative avenues of communication. *City of Renton*, 475 U.S. at 47, 106 S.Ct. at 928, citing *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984).

By its terms the By-law in the present case prohibits, between 1:00 a.m. and 6:00 a.m., **all** activity licensed under Mass. Gen.L. ch. 140, §§ 177A, 181, and 183A.[4] "Any inference that government's aim is keeping people ignorant of ideas or information that it considers dangerous must normally be made in the first instance from the face of the statute." L. Tribe, *supra* at 794–95. Here, after a close reading of the By-law, this Court draws no inference that on its face the By-law aims at either the content of the movies or their influence on their viewers. Indeed, National concedes as much. National does not attempt to argue that the By-law is content based. To the contrary, at ¶ 26 of Count One of the Complaint alleging violations of the First Amendment and Article Sixteen of the Massachusetts Declaration of Rights, National complains that the By-law represents a "purported effort to solve certain alleged problems where such prob-

4. *See supra* at 1025, n. 1.

lems are shown to be unrelated to the speech activity itself." Thus National concedes that justification of the By-law stems from the Town's desire to curb the secondary effects of late shows. Therefore, it is undisputed, and this Court rules, that as matter of law the By-law is content neutral.

■ Analysis does not end at this point. Even though the By-law is content neutral, it does restrict somewhat a vitally important outlet for speech and thus the Court must examine whether the By-law is legitimately aimed at the secondary effects of late night entertainment and, if so, whether those secondary effects are of significant governmental interest and allow reasonable alternatives for the same communication. *Young v. American Mini Theatres*, 427 U.S. 50, 63 n. 18, 96 S.Ct. 2440, 2449 n. 18, 49 L.Ed.2d 310 (1975) (a reasonable time, place, and manner restriction must advance a significant governmental interest); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984) (a reasonable time, place, and manner restriction must allow reasonable alternatives for that same communication).

The Minutes of the Board Meetings and the transcripts of Town Meetings during the discussions concerning National reveal that the Town was ostensibly concerned about late night traffic as well as actual and potential security problems at the Showcase and surrounding neighborhood. (*See generally,* Town's Exs. 4–33; National's Ex. 28, 29, 40, 42, 43, 100, 101). According to the deposition testimony of Board members, the By-law was adopted in part to quell traffic problems and in part to ensure that there was a period of time during the late evening hours, when Town citizens were generally sleeping, that was devoid of retail sales and other commercial activity. (Kehoe Dep. at 39–40, 71, 74–79; Taurasi Dep. at 34, 35, 37–39, 42, 52–54; Boylen Dep. at 27; *see also* Greenwood Dep. at 53, 54, 59.)

National does not directly impugn this evidence but it does argue that the proffered "significant government interest" is, in fact, a sham and that the passage of Article Forty and the subsequent Article Four are racially motivated and seek to target blacks and restrict their entertainment options.[5] National suggests that references such as "undesirable element that's attracted by General Cinema activity" (Transcript of April 24, 1989 Town Meeting—National's Ex. 34 at 60–61), "people problems" (Transcript of April 10, 1989 Town Meeting—National's Ex. 33 at 92), and "nice little out-of-towners" (Transcript of April 24, 1989 Town Meeting—National's Ex. 34 at 60) carry racial overtones and are but code words to mask racial animus. It clinches its argument with reference to its secret survey.

While the Court, for purposes of this motion, will accept the arithmetic accuracy of the survey and the conclusory assertions that it conforms to accepted marketing survey practice, it is simply not probative, as a matter of logic, of most of the essential points for which National advances it.

It is undisputed that the survey was conducted only for a few weeks during the summer of 1993. Even so, the Court puts aside the considerations that movies are marketed primarily to the young, that school was out, that homework was over, and that people were moving into a summer jobs and vacation schedule since the affidavit of Anthony D. Pungitore, manager of the Showcase since 1986, avers that late show patrons are, and have been at all material times, "predominantly" black, while moviegoers earlier in the evening are "predominantly" white. The Court therefore accepts the racial mix of Showcase audiences as proffered by National.

But what of it? On the present record, there is not the slightest evidence that anyone ever gave this a thought until National began totaling up its customers and separating them by race. The summary judgment record is devoid of evidence that race played a role in the decision to adopt the By-law. Selectman Hoell testified that he has no knowledge of the race or color of patrons of

---

5. Although National is not a member of a protected class, this Court rules that it has standing to assert the rights of its patrons. *See Secretary of State of Maryland v. Joseph H. Munson Co. Inc.,* 467 U.S. 947, 955–58, 104 S.Ct. 2839, 2846–47, 81 L.Ed.2d 786 (1984).

the late shows and that, prior to his deposition, he had never discussed the race or color of theater patrons with neighbors of the Showcase. (Hoell's Dep., Town's Ex. 25 at 81–82.) Selectwoman Kehoe also testified that she had no knowledge, at the time of the enactment of the By-law, as to the race of the patrons of the late shows. (Kehoe Dep., Town's Ex. 15 at 89.) Also according to Kehoe and Selectman Taurasi the Town has never conducted demographic studies relative to the late shows. *Id.;* (Taurasi Dep., Town's Ex. 16 at 57.) While a court must be hesitant to grant summary judgment where matters of mental intent are at issue, *Hahn v. Sargent,* 523 F.2d 461, 468 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), since *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), National must come up with **some** evidence that would carry the burden of production on the issue of racial animus. *Villanueva v. Wellesley College,* 930 F.2d 124, 127–28 (1st Cir.) *cert. denied,* —— U.S. ——, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). It has had three years to do so. It has failed.

To the contrary, upon the present record "a city's 'interest in attempting to preserve the quality of urban life is one that must be accorded high respect.'" *City of Renton,* 475 U.S. at 50, 106 S.Ct. at 930, quoting *Young v. American Mini Theatres,* 427 U.S. 50, 71, 96 S.Ct. 2440, 2453, 49 L.Ed.2d 310. In order for the Town to show that it was attempting to preserve the quality of urban life, it need only establish that evidence relied upon in enacting the By-law was "reasonably believed to be relevant to the problem that the [Town] addresse[d]." *City of Renton,* 475 U.S. at 51–52, 106 S.Ct. at 931. The evidence in the present case discloses that the Town relied upon the complaints of neighborhood and nighttime disturbances voiced by the residential abutters of the Showcase complex. It is undisputed that the Town's residents expressed general displeasure with the theater complex. National concedes that between February 2, 1989 and

April 6, 1989 representatives of National "met with Town of Dedham residents on five separate occasions. During the course of these meetings, National proposed and developed plans to alleviate any articulated concerns pertaining to traffic, noise and security at or around the Showcase Cinemas complex." (Complaint ¶ 10). While the Court recognizes that National undertook to assuage the concerns of the Town residents, the Town's choice of a different method to combat those problems does not call into question either the Town's articulated concerns or relevance of the By-law to those concerns. *City of Renton,* 475 U.S. at 52, 106 S.Ct. at 931.

This Court finds, therefore, that the By-law is genuinely aimed at the secondary effects of late night movies [6] and rules that dealing with these articulated secondary effects constitutes a valid governmental interest.

Balked of victory in challenging the 'significant governmental interest' portion of the test, National turns to challenge the assertion that the By-law allows reasonable alternatives for the same communication. National concedes, of course, as it must, that the Showcase runs the same movies at both the early and late night showings, the earlier showings being entirely unaffected by the By-law. To the logical observation that the afternoon and evening showings afford a reasonable venue for the same communication, however, National again has recourse to the secret survey, this time with a bit more success.

Taking the survey and the Pungitore affidavit together, and drawing all inferences in favor of National, it appears that more blacks than whites consistently attend the late shows. It follows, therefore, that prohibiting the late show will affect more blacks than whites.

National then seeks to bootstrap its so-called 'disparate impact' analysis into a re-

---

**6.** This determination is what my friend and colleague Judge Keeton refers to as finding a "premise fact." Robert E. Keeton, Legislative Facts and Similar Things: Deciding Disputed Premise Facts, 73 Minn.L.Rev. 1, 8 (1988). This is to be distinguished from the finding made *infra* under Fed.R.Evid. 104(a). Keeton, *supra* at 8 n. 19, and 68 n. 185.

quirement that the By-law be subjected to strict scrutiny. The attempt will not wash.

National asserts that the Supreme Court's recent decision in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, —— U.S. ——, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ("*Babalu*"), requires this Court to go back and examine both direct and circumstantial evidence to determine if the object of the law was to restrict blacks from attending the late night shows. In *Babalu*, the Supreme Court warned that a "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens" on selected groups. *Id.* at ——, 113 S.Ct. at 2232. *Babalu*, however, dealt with an ordinance explicitly prohibiting ritualistic animal sacrifices. The Supreme Court ruled that the use of the word "ritual" and "sacrifice" necessarily implicated religious practices and therefore the ordinance targeted the Santeria religion and, in the parlance of the present analysis, was not content neutral. *Id.* at ——, 113 S.Ct. at 2228. *See* Stephen L. Carter, The Resurrection of Religious Freedom?, 107 Harv.L.Rev. 118, 125 (1993). Here, in contrast, this Court has ruled that the By-law is genuinely content neutral and a valid exercise of a Town's police powers. The *Babalu* decision is not controlling.

The fact that the By-law may incidentally affect one protected class more than the general public does not necessarily subject that ordinance to strict scrutiny. Though otherwise inapposite, *Babalu* does provide some guidance on this point, since the general applicability requirements that undergird the Freedom of Religion Clause parallel First Amendment jurisprudence. *Babalu*, —— U.S. at ——, 113 S.Ct. at 2232 (citations omitted). Indeed, freedom of religion cases have often addressed the issue of ordinances that seemingly have a greater adverse affect on particular religions than on the general populace. "In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling

governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Babalu*, —— U.S. at ——, 113 S.Ct. at 2226, citing *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Such is the situation here.

Even so, the serious nature of the allegation of "disparate impact" has caused the Court to scrutinize the record with care in light of the teachings of *Babalu*. Such scrutiny reveals that the entire claim of "disparate impact" rests on a logical fallacy. The question presented in this step of the analysis is whether there are reasonable alternatives for the same communication—here specifically whether the afternoon and evening showings of the same movies in the same theater constitute such a reasonable alternative. The secret survey and the Pungitore affidavit establish that more blacks than whites attend the late shows. The question, the, is this—what happens to the movie communication with these people if the By-law bans the late shows? It is here National claims the disparate impact.

The claim is nonsense. To prove that canceling the late shows would extinguish a significant amount of protected communication, the survey inquired of every third theater patron—during the short period it was conducted—their reasons for attending. This written survey was conducted regardless of the race of the patron. It is, therefore, simply not possible to infer—the secret survey itself does not even make this claim, it is found in the affidavit of Lara Jordan James—that the effects of closing down the late night shows are any different for blacks as a group than for whites. That is, for all that appears, the effect of closing down the late night shows is identical for each patron and his or her alternative entertainment options are identical regardless of race. There simply is no disparate effect along racial lines and this is the concern where the issue is the adequacy of alternative times for the same communication.[7]

---

7. It is important to understand what the Court is doing here. The James' affidavit expressly concludes, "[C]ancelling this show would have a

disproportionate impact on [black] members of the theater-going public.... [T]he late show is the only opportunity that the Theater has ... to

National is thus left with the claim that closing down its late night shows will deprive certain of its patrons of the opportunity to visit the Showcase (and National of the opportunity to screen films for them for a fee). This claim makes some sense. National does not run its late shows as a public service. Its aim is to make money. If everyone who attends the late shows would come to the matinee or evening shows, surely the economies of scale and the resultant personnel savings would themselves force National to cease late shows wholly without the By-law.[8] The Court thus credits National's claim that the By-law will operate to deprive it of a portion of its audience.

The question, however, is whether the By-law allows for **reasonable** alternatives for the same communication. National, again pointing to its secret survey, says not. While the Court must give every inference to National in adjudicating this summary judgment motion, it cannot help but approach the survey with some skepticism since no raw data have been provided and the individual responses are aggregated and appear to be summarized in a fashion slanted to favor National's contentions. Still, to give the survey its due, it appears that during the short time it was conducted that 14% of the late night patrons reported they had to work late and could only come to "a late show" while an additional 11% may[9] have considered this their only entertainment option. Thus, giving National every reasonable inference, a full quarter of its late show patrons (or roughly 75–125 people each evening, given the survey ticket tallies) will miss the movies they otherwise would have seen at the Showcase if the By-law is enforced. The Court rules, nevertheless, that given the content neutral nature of

the By-law and the legitimate governmental interests that support it, the By-law does afford reasonable alternative means of expressing the same communication.

National argues, even so, that less restrictive, narrowly tailored means could remedy the same problems as sought to be curbed by the By-law. "The term 'narrowly tailored' so frequently used in our cases, has acquired a secondary meaning. More specifically, as commentators have indicated, the term may be used to require consideration of whether lawful alternative and less restrictive means could have been used." *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 280 n. 6, 106 S.Ct. 1842, 1850 n. 6, 90 L.Ed.2d 260 (1986). A content neutral analysis, however, does not require the Court to find that the restriction is a narrowly tailored means to an end. The Supreme Court has held that the "[l]ess-restrictive-alternative analysis ... has never been part of the inquiry into the validity of a [content-neutral] time, place, and manner regulation. It is enough that the ... restriction substantially serves the Government's legitimate ends." *Regan v. Time, Inc.*, 468 U.S. 641, 657, 104 S.Ct. 3262, 3271, 82 L.Ed.2d 487 (1984) (footnote omitted). Consequently this Court need not and will not engage in a less restrictive alternative analysis. The holding that the By-law affords reasonable alternative means for the same communication will stand.

■ As its last ditch stand, National argues that the By-law is violative of due process in that it is unconstitutionally vague and targets the Showcase, thus demanding a higher level of scrutiny.

In the First Amendment area especially, the Supreme Court requires "precision of

---

communicate with a distinct portion of its patrons." (National's Ex. 110.) This is purported expert opinion. The Court, however, rejects these conclusions as logically indefensible in exercise of its duty to make preliminary findings under Fed.R.Evid. 104(a) before receiving so-called expert opinions. *See LeBlanc v. Great American Inc. Co.*, 6 F.3d 836, 848 (1st Cir.1993) (affirming district court decision upon summary judgment record to exclude statistical opinion due to inadequate sample size).

8. This conclusion assumes no competitor in the relevant market is exhibiting movies during the

late night time slot. The summary judgment record here makes no mention of any such competition.

9. The word "may" is appropriate here since the survey is internally inconsistent on the point, reporting elsewhere that but 5% of late show patrons had no other entertainment option. The latter figure is the more persuasive. It corresponds generally with those who say they would spend time with friends (5%), play board or video games. at home (4%), or make love (3%) were there no late show to attend.

drafting and clarity of purpose." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217–18, 95 S.Ct. 2268, 2277, 45 L.Ed.2d 125 (1975). An ordinance which is imprecise and ambiguous as to substantial provisions is void for vagueness. *Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972); *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). National pins its vagueness claim on the fact that the By-law fails to define precisely what constitutes licensed activity. Here, the By-law prohibits the conduct of any activity licensed under Mass. Gen.L. ch. 140, §§ 177A, 181, and 183A between the hours of 1:00 a.m. and 6:00 a.m. Activities licensed under Mass.Gen.L. ch. 140, § 181 include "theatrical exhibitions, public shows, public amusements and exhibitions of every description." The By-law provides sufficient guidance as to what activities are specifically proscribed. This includes public movie showings. *See City of Fitchburg v. 707 Main Corp.*, 369 Mass. 748, 751, 343 N.E.2d 149 (1976).

Last, National asserts that since the Showcase is the only licensed entertainment complex conducting its license after 1:00 a.m. and since it is named on the petition which ultimately led to the proposed Article Forty, Showcase is the victim of targeting. In support of this contention, National cites *Leathers v. Medlock*, 499 U.S. 439, 447, 111 S.Ct. 1438, 1443, 113 L.Ed.2d 494 (1991) (a state sales tax on cable services, which exempted print media, did not violate the First Amendment) which held that an ordinance "will trigger heightened scrutiny if it discriminates on the basis of the content of ... speech." This case is wholly inapplicable to the present situation since the By-law is not content based.[10] In fact, National is not the only commercial business whose profits are curtailed by Town By-laws which prohibit late night business activity.[11]

## CONCLUSION

The Court declares that the By-law at issue here is content neutral, serves a legitimate governmental interest, and offers reasonable alternative avenues for the same communication. It is, therefore, a reasonable time, place, and manner restriction on First Amendment rights which does not violate the Equal Protection clause, as its incidental effect upon a protected class is no different than on society generally. Moreover, the Court rules that National has received such process as is its due from the Town and from this Court.[12]

For these reasons, the Town's motion for summary judgment is GRANTED.

10. National also looks to *Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). *Minneapolis Star*, however, also involved an ordinance that was not content neutral.

11. The Town has a progression of ordinances designed to insure that commercial activities do not impinge on private, residential life. Section 42 of the Town's Revised By-law, as amended in 1976, prohibits individuals from the retail sale of food between the hours of 12:00 midnight and 6:00 a.m. In 1978, the Town rolled back the closing time for licensed establishments which sell alcoholic beverages from 2:00 a.m. to 1:00 a.m. Section 42A, added to the By-laws in 1976 and amended in 1979, prohibits retail establishments from the sale of any retail commodity (except fuel products) between 12:00 midnight and 6:00 a.m. Finally, in 1980 the Town voted to prohibit the illumination of signs for retail

establishments which were proscribed from operation under section 42A.

12. While the Court recognizes that in some respects the protections of the Declaration of Rights of the Constitution of Massachusetts sweep more broadly than the cognate provisions of the Bill of Rights, *see e.g., Commonwealth v. Sees*, 374 Mass. 532, 536–38, 373 N.E.2d 1151 (1978) (nude dancing protected as expressive); *see generally* Herbert P. Wilkins, Judicial Treatment of the Massachusetts Declaration of Rights in Relation to Cognate Provisions of the United States Constitution, 14 Suffolk U.L.Rev. 887 (1980), no broader protection for the late shows is here claimed to arise out of the Constitution of Massachusetts. The point being waived, the Court assumes, without deciding, that the freedom of speech protections found in the two constitutions are coextensive.