USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 94-1176 NATIONAL AMUSEMENTS, INC., Plaintiff, Appellant, v. TOWN OF DEDHAM, Defendant, Appellee. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ _________________________ Theodore E. Dinsmoor, with whom Finnegan and Stanzler, P.C., ____________________ ___________________________ Philip Y. Brown, Grant Schwartz & Brown, Tad Jankowski, and Lori ________________ ______________________ _____________ ____ Wiechelt were on brief, for appellant. ________ Joyce Frank, with whom Kopelman and Paige, P.C. was on ____________ __________________________ brief, for appellee. _________________________ January 4, 1995 _________________________ SELYA, Circuit Judge. This appeal presents a medley of SELYA, Circuit Judge. _____________ constitutional questions driven by the passage of a municipal by- law that effectively prohibits the exhibition of motion pictures at the town's only theater between the hours of 1:00 a.m. and 6:00 a.m. After careful consideration of appellant's asseverational array, we affirm the district court's entry of summary judgment in the municipality's favor. I. BACKGROUND I. BACKGROUND Plaintiff-appellant, National Amusements, Inc., owns and operates Showcase Cinemas (Showcase), a complex containing 12 theaters located on Route 1 in Dedham, Massachusetts. In 1978, appellant began exhibiting "midnight movies" on Friday and Saturday nights. These performances started between 11:30 p.m. and 12:30 a.m., and ended between 1:00 a.m. and 2:30 a.m. On January 12, 1989, at a meeting of the Board of Selectmen (Dedham's governing body), Selectman Kehoe raised the issue of secondary effects, expressing particular concern over purported traffic and security problems associated with Showcase's operation of its business. At a selectmen's meeting the following week, after another selectman reported that he had received complaints about disruptions connected with appellant's exhibition of midnight movies, the Board placed a proposed by-law amendment on the warrant for the forthcoming annual Town Meeting.1 The text of this proposal, denominated "Article 40,"  ____________________ 1The venerable institution of the town meeting is perhaps more celebrated in New England than elsewhere. The colonial government of Massachusetts first passed enabling legislation, 2 read in pertinent part: To see if the Town will vote to amend Chapter XIII of the Town By-Laws by adding the following new section: Section 42B- No holder of an entertainment license for theatrical exhibition, public show, public amusement, concert, dance or exhibition . . . shall conduct business between the hours of 12 midnight and 6:00 a.m. The Board also sent a letter to William Towey, appellant's senior vice-president, memorializing its "concern about the problems generating from the Showcase Cinemas after the weekend late shows," and indicating that the Board "would like to discuss this situation . . . ." On February 2, Towey and approximately 30 interested residents met with the selectmen and discussed matters related to the exhibition of midnight movies. In response to the residents' articulated concerns, Towey conferred with various townsfolk, including the police chief. Thereafter, appellant agreed to undertake, at its expense, a variety of measures designed to enhance security, reduce noise levels, control traffic, and ameliorate the problem of litter. Despite these concessions, the voters approved  ____________________ entitled the "Town Act," in 1636. A 1647 version of the Town Act gave municipalities the "power to make such laws and Constitutions as may concern the welfare of their Town. Provided they be not of a criminal but only of a prudential nature . . . and not repugnant to the publick Laws." 1647 Mass. Town Act, The ___ Laws and Liberties of Massachusetts 50 (1648 & reprint 1929). _____________________________________ While Dedham's present-day Town Meeting operates under the aegis of the Home Rule Amendment to the Massachusetts Constitution, see ___ Mass. Const. amend. art. 2, 1-9, amended by Mass. Const. __________ amend. art. 89; see also Bloom v. City of Worcester, 293 N.E.2d ___ ____ _____ _________________ 268, 274-75 (Mass. 1973), it, too, possesses lawmaking capacity, see Mass. Const. amend. art. 2, 6. ___ 3 Article 40 at a Town Meeting held on April 10, 1989 (first amending it to exempt ballroom dancing and to change the closing time to 12:30 a.m.). Under the Massachusetts scheme, municipal by-laws cannot take effect without the imprimatur of the Attorney General of the Commonwealth of Massachusetts. See Mass. Gen. L. ch. 40, ___ 32. The Attorney General refused to sanction Article 40 on the ground that the proposed amendment, by distinguishing ballroom dancing from other forms of dance, was not content-neutral and was, therefore, unconstitutional. Undaunted, the Board of Selectmen proposed a neoteric amendment, Article 4, for inclusion on the next Town Meeting warrant. Article 4 provided in pertinent part: To see if the Town will vote to amend Chapter XIII of the Revised By-Laws of the Town of Dedham, entitled "Police Regulations" by adding a new section at the end thereof, as follows: Section 57. __ Unless otherwise restricted, no holder of a license issued by the Town of Dedham, pursuant to Massachusetts General Laws, Chapter 140, Sections 177A, 181 and 183A, shall permit any activity licensed thereunder to be conducted between the hours of 1:00 a.m. and 6:00 a.m.2 The voters adopted Article 4 at a special Town Meeting held on November 6, 1989. The Attorney General approved it on February 8, 1990. On the day that Article 4 took effect,  ____________________ 2The state laws cited in Article 4 authorize municipalities, in general, to grant and revoke licenses for amusement devices, concerts, dances, exhibitions, and public shows for which an admission fee is charged. 4 appellant sued, charging that the by-law violated its rights under both the federal and state constitutions.3 Following pretrial discovery, Dedham successfully moved for summary judgment. See National Amusements, Inc. v. Town of Dedham, 846 ___ __________________________ _______________ F. Supp. 1023 (D. Mass. 1994). This appeal ensued. II. THE SUMMARY JUDGMENT STANDARD II. THE SUMMARY JUDGMENT STANDARD A federal court may grant summary judgment in a civil action "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court fleshed out this rule in a trilogy of cases decided in the 1985- 86 term. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); ___ _____________ _______ Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita ________ ___________________ __________ Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). In ________________ __________________ general, these cases require that a party seeking summary judgment make a preliminary showing that no genuine issue of material fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue. See Celotex, 477 U.S. at 324. ___ _______ To satisfy the criterion of trialworthiness, and thereby forestall summary judgment, an issue must be "genuine,"  ____________________ 3Dedham agreed not to enforce the by-law against Showcase pendente lite. This stipulation remains in effect. ________ ____ 5 that is, the evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, see Mack v. ___ ____ Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989), ___________________________ must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side. See Liberty Lobby, ___ _____________ 477 U.S. at 250; Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. ____ _______ 1975), cert. denied, 425 U.S. 904 (1976). Trialworthiness _____ ______ necessitates "more than simply show[ing] that there is some metaphysical doubt as to the material facts." Matsushita, 475 __________ U.S. at 586. As we have stated, "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve . . . ." Mack, 871 ____ F.2d at 181. Trialworthiness requires not only a "genuine" issue but also an issue that involves a "material" fact. See Liberty ___ _______ Lobby, 477 U.S. at 248. In this context, the term "material" _____ means that a fact has the capacity to sway the outcome of the litigation under the applicable law. See id.; see also United ___ ___ ___ ____ ______ States v. One Parcel of Real Property, Etc. (Great Harbor Neck, ______ __________________________________ ___________________ New Shoreham, R.I.), 960 F.2d 200, 204 (1st Cir. 1992). If the __________________ facts on which the nonmovant relies are not material, or if its evidence "is not significantly probative," Liberty Lobby, 477 _____________ U.S. at 249-50 (citations omitted), brevis disposition becomes ______ appropriate. An order granting summary judgment engenders plenary 6 review. See Pagano v. Frank, 983 F.2d 343, 347 (1st Cir. 1993). ___ ______ _____ In conducting such review, we examine the summary judgment record in the light most friendly to the summary judgment loser, and we indulge all reasonable inferences in that party's favor. See id. ___ ___ Withal, we need not credit purely conclusory allegations, indulge in rank speculation, or draw improbable inferences. See Medina- ___ _______ Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8(1st Cir. 1990). _____ _________________________ III. THE FIRST AMENDMENT CLAIM III. THE FIRST AMENDMENT CLAIM The heart of appellant's case is its multifaceted claim that the municipal by-law violates the First Amendment. We turn directly to that claim (relegating appellant's related overbreadth challenge to Part IV(C), infra). _____ A. Putting First Things First. A. Putting First Things First. __________________________ In the context of First Amendment challenges to government regulations that burden speech, the Supreme Court has identified two differing modes of analysis, or levels of scrutiny, that may come into play. Since entertainment constitutes a form of speech, fully protected by the First Amendment, see Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 65 ___ _____ ______________________ (1981), our initial task is to determine the appropriate level of judicial scrutiny that attaches to an analysis of Article 4. We begin this endeavor by mapping the choices and putting them into workable perspective. Freedom of speech is among the most precious of our constitutional rights. Thus, courts have long recognized that, when governmental action places speech in special jeopardy, 7 special protections must apply. For this reason, a court embarking on an inquiry into the constitutionality of governmental action will devote "the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens on speech because of its content." Turner Broadcasting ____________________ Sys., Inc. v. FCC, 114 S. Ct. 2445, 2459 (1994); accord Simon & __________ ___ ______ _______ Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 112 S. ______________ _______________________________________ Ct. 501, 508 (1991); Widmar v. Vincent, 454 U.S. 263, 276 (1981). ______ _______ Strict scrutiny is desirable in these circumstances because such laws "pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." Turner Broadcasting, 114 S. ___________________ Ct. at 2458. Courts therefore treat content-based regulations as "presumptively invalid" under the First Amendment. R.A.V. v. ______ City of St. Paul, 112 S. Ct. 2538, 2542 (1992). ________________ In contrast, regulations that burden speech, but that are unrelated to the speaker's viewpoint or to the content of the proscribed speech, are subject to a less taxing (but nonetheless meaningful) level of judicial scrutiny. This disparate treatment is justified because, on the whole, non-content-based regulations pose "a less substantial risk of excising certain ideas or viewpoints from the public dialogue." Turner Broadcasting, 114 ___________________ S. Ct. at 2459. Phrased another way, since regulations that are not content-based portend less jeopardy for freedom of speech, the special prophylaxis that strict scrutiny ensures is less 8 necessary. This dichotomy has important practical ramifications for constitutional analysis as the applicable indices of constitutionality vary according to the level of scrutiny that attaches. Strict judicial scrutiny makes it less likely that any given regulation will clear the constitutional hurdle for, in its domain, the operative test is whether a regulation "is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." Arkansas Writers' Project, Inc. v. Ragland, ________________________________ _______ 481 U.S. 221, 231 (1987). Under ordinary First Amendment scrutiny sometimes called "intermediate" scrutiny in recognition of the fact that all First Amendment scrutiny is more ___ demanding than the "rational basis" standard that is often used to gauge the constitutionality of economic regulations, see ___ Turner Broadcasting, 114 S. Ct. at 2458; see also Madsen v. ____________________ ___ ____ ______ Women's Health Ctr., Inc., 114 S. Ct. 2516, 2537 (1994) (Scalia, __________________________ J., concurring in part and dissenting in part) the test is less exacting in both the "ends" and "means" segments of the equation. Thus, where intermediate scrutiny pertains, restrictions on the time, place, or manner of protected expression "are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." Clark v. Community for _____ ______________ Creative Non-Violence, 468 U.S. 288, 293 (1984). _____________________ 9 B. Identifying the Level of Scrutiny. B. Identifying the Level of Scrutiny. _________________________________ In light of these differing analytic modalities, it is unsurprising that many First Amendment battles over the constitutionality of government regulations start with a debate about what level of scrutiny is appropriate. The instant case is no exception. Here, appellant advances two main theses in support of its exhortation that Dedham's by-law must be subjected to strict scrutiny. First, it maintains that Article 4 is content-based. Second, it maintains that Article 4 impermissibly singles out, and thus targets, Showcase's exhibition of midnight movies. Neither thesis merits a passing grade. 1. Relationship to Content. Appellant's flagship 1. Relationship to Content. _________________________ claim portrays Article 4 as a content-based regulation. If sustainable, this characterization would require us to employ the most exacting scrutiny in evaluating the by-law's constitutionality. See, e.g., Simon & Schuster, 112 S. Ct. at ___ ____ _________________ 508. Be that as it may, we do not think that the characterization is apt. The concept of what constitutes a content-based as opposed to a content-neutral regulation has proven protean in practice. The Court's cases teach that the "principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward v. Rock Against ____ ____________ Racism, 491 U.S. 781, 791 (1989) (citation omitted). Even a ______ 10 regulation that does not choose sides or otherwise convey disapproval of a particular message can run afoul of this dictate because the "First Amendment's hostility to content-based regulation extends . . . to prohibition of public discussion of an entire topic." Consolidated Edison Co. v. Public Serv. ________________________ ____________ Comm'n, 447 U.S. 530, 537 (1980); accord Simon & Schuster, 112 S. ______ ______ ________________ Ct. at 509. This does not mean, however, that the sovereign must steer away from content at all costs, or else risk strict scrutiny. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Ward, 491 U.S. at 791; see also City of Renton v. Playtime ____ ___ ____ ________________ ________ Theatres, Inc., 475 U.S. 41, 47-48 (1986). ______________ The subject of our inquiry here seems at first blush to be the very model of a content-neutral regulation. Article 4, by its terms, does not demand reference to the content of the affected speech in order to determine if the ordinance applies; the only requisite reference is to an external characteristic: whether the activity is licensed under one of several particular sections of state law. Furthermore, nothing in the record suggests that Article 4 arose out of an effort to suppress some particular message communicated through Showcase's selection of motion pictures. In all events, any such forensic fizgig would be easily defused, because the midnight movies comprise exactly the same fare that appellant displays during the hours when the theater's operation is totally unaffected by Article 4. 11 Faced with so formidable a set of barriers, appellant hems and haws. In the end, it theorizes that Article 4 is content-based because, while banning licensed activity in the early morning hours, the by-law leaves untouched other forms of expression, say, unlicensed entertainment, street demonstrations, public speeches, and candlelight vigils. In appellant's view, this distinction is driven by a value judgment the town's conscious decision to place less worth on licensed entertainment than on unlicensed entertainment and thus constitutes "irrational discrimination between the secondary effects of prohibited and permitted forms of expression based solely on the charge of an admission fee." Appellant's Brief at 26. As authority for this bold proposition, appellant cites City of Cincinnati v. Discovery Network, Inc., 113 S. Ct. 1505 ___________________ ________________________ (1993). We do not believe that the case can carry the cargo that appellant piles upon it. In Discovery Network, a city, motivated _________________ by interests in both safety and aesthetics, imposed a categorical ban on the distribution, via newsrack, of "commercial handbills," but allowed the continued distribution of "newspapers" (containing primarily noncommercial speech). Id. at 1507-09. ___ This policy clearly favored noncommercial speech over commercial speech, and, under it, "whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack." Id. at 1516. On that ___ understanding, the Court found the ban to be content-based. See ___ id. at 1516-17. In so holding, the Justices, though ___ 12 acknowledging that the city had a legitimate interest in limiting the number of newsracks, gave short shrift to Cincinnati's suggestion that the regulation was content-neutral because it was born of a desire to combat certain distasteful secondary effects associated with newsracks. The Court contrasted the case with Renton, explaining that Cincinnati had failed to identify any ______ "secondary effects attributable to respondent publishers' newsracks that distinguish them from the newsracks Cincinnati permits to remain on its sidewalks." Id. at 1517. ___ Appellant's reliance on Discovery Network is mislaid. _________________ Whether Cincinnati's regulation applied to a particular newsrack was determined by necessary reference to the subject matter of the specific publications contained therein a telltale harbinger of content-based regulation. Dedham's regulation is not of this ilk; Article 4 applies without reference to either the content of the entertainment or the communicative impact of any speech. Unlike in Discovery Network, the applicability __________________ determination is based solely on an external, content-neutral characteristic the existence of an admission fee. To rub salt in an open wound, appellant not only misapprehends the import of Discovery Network, but also overreads _________________ the Court's opinion. The case does not stand for the sweeping proposition that any differential treatment of speakers renders a ___ regulation content-based. Instead, the Court's holding pivots on the conclusion that, though the city's underlying purpose in enacting the ordinance was proper, the differential treatment of 13 speakers had no relationship to that underlying purpose.4 See ___ id. at 1517. Thus, Discovery Network establishes a much narrower ___ _________________ proposition: that, even when a municipality passes an ordinance aimed solely at the secondary effects of protected speech (rather than at speech per se), the ordinance may nevertheless be deemed ___ __ content-based if the municipality differentiates between speakers for reasons unrelated to the legitimate interests that prompted _________________________________________________________________ the regulation. Cf. Carey v. Brown, 447 U.S. 455, 465 (1980) ______________ ___ _____ _____ (sustaining challenge to statute permitting labor, but not nonlabor, picketing, because "nothing in the content-based labor- nonlabor distinction ha[d] any bearing" on the state's legitimate interest in privacy). Here, Dedham's stated interest in enacting Article 4 is, and has been, to reduce the number of sources of potential noise and disturbance.5 Such an objective is plainly within the office of municipal government. Accordingly, the relevant question reduces to whether Dedham has offered a neutral justification for the differential treatment that Article 4 accords to purveyors of licensed entertainment, on the one hand, and purveyors of unlicensed entertainment, on the other hand. On the facts of this case, the question requires us to ascertain whether there are any secondary effects attributable to licensed  ____________________ 4In this regard, it is interesting that, as applied, the regulation outlawed only 62 newsracks while permitting over 1,500 others to remain in service. See Discovery Network, 113 S. Ct. ___ _________________ at 1510. 5We discuss appellant's claim that Dedham's stated interest is illusory and-or pretextual in Part III(C)(1), infra. _____ 14 (commercial) amusements that distinguish them from the unlicensed (noncommercial) amusements that Dedham has left unregulated. See ___ Discovery Network, 113 S. Ct. at 1517. _________________ We answered the same question in a slightly different setting in Fantasy Book Shop, Inc. v. City of Boston, 652 F.2d _______________________ ______________ 1115 (1st Cir. 1981). There, several adult bookstores challenged the constitutionality of a municipal licensing ordinance (enacted pursuant to Mass. Gen. L. ch. 140, 181, a statute referenced in Dedham's amended by-law) on the ground, inter alia, that the _____ ____ ordinance treated commercial and noncommercial amusements differently. In response, we rejected appellant's argument that the statute and the ordinance are facially underinclusive by reason of their failure to subject non- commercial amusements to the same licensing requirements. We think a legislature could reasonably conclude that non-commercial amusements present sufficiently less likelihood of the harms sought to be prevented to justify their differential treatment. Fantasy Book Shop, 652 F.2d at 1121 n.6 (offering examples). _________________ In the case at bar, we think it self-evident that a legislative body might reasonably conclude that the frequency and regularity of activity inherent in an ongoing commercial venture heighten the probability of late-night disruptions and boost the number of likely participants. The profit motive itself, which encourages marketing and promotion aimed at increased consumption, is the surest indicator that, where commercial amusements operate, crowds will probably gather. Hence, the distinction drawn by Dedham between licensed and unlicensed 15 entertainment bears a rational relationship to the specific interests cited by it in enacting Article 4. It follows inexorably that, notwithstanding the differential treatment that the by-law gives to unlicensed as opposed to licensed entertainment, it cannot successfully be condemned as content- based. 2. Targeting. Warbling from a different perch, 2. Targeting. _________ appellant asseverates that Article 4 should be strictly scrutinized because it singles out, and in that sense targets, Showcase's midnight movies. This asseveration rests on the notion that strict scrutiny is always justified when a ______ municipality enacts an ordinance that, in practical effect, regulates the First Amendment rights of a select group. We consider the notion misguided. In mounting its "targeting" offensive, appellant relies primarily on Minneapolis Star & Tribune Co. v. Minnesota Comm'r _______________________________ ________________ of Revenue, 460 U.S. 575 (1983). In Minneapolis Star, the Court __________ _________________ struck down a state use tax on newsprint and ink, ruling that the tax violated the First Amendment both because it "singled out the press for special treatment" by taxing newspapers in a manner "without parallel in the State's tax scheme," id. at 582, and ___ because it impermissibly "target[ed] a small group of newspapers" within the press as a whole, id. at 591.6 In reaching this ___ result, the Court consigned the Minnesota statute to strict  ____________________ 6Because the Minnesota tax exempted the first $100,000 worth of newsprint and ink used annually by each publisher, its burden fell almost exclusively on large newspapers. 16 scrutiny, reasoning: When the State singles out the press, . . . the political constraints that prevent a legislature from passing crippling taxes of general applicability are weakened, and the threat of burdensome taxes becomes acute. That threat can operate as effectively as a censor to check critical comment by the press . . . . Id. at 585. The Court added that "differential treatment, unless ___ justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." Id. ___ Before attempting to transplant the teachings of Minneapolis Star, it is important to recall that, in a later _________________ case, the Court revisited the matter of differential taxation. See Leathers v. Medlock, 499 U.S. 439 (1991). There, the Court ___ ________ _______ ruled that Arkansas could extend its generally applicable sales tax to cable television and satellite services, while exempting print media, without offending the First Amendment. The Court refined the analysis it had crafted in Minneapolis Star, _________________ explaining that targeting engenders strict scrutiny only when regulations (1) single out the press, (2) take aim at a small group of speakers, or (3) discriminate on the basis of the content of protected speech. Id. at 447. Because the Arkansas ___ tax measure avoided these pitfalls for example, there was "no indication" that Arkansas "targeted cable television in a purposeful attempt to interfere with . . . First Amendment activities," id. at 448 the Court concluded that the statute ___ 17 did not warrant strict scrutiny. It is incumbent upon us to inspect this case through the precedential prism of Minneapolis Star and Leathers. Reduced ________________ ________ to bare essence, appellant's argument for strict scrutiny based on targeting necessarily rises or falls on the second of the three criteria identified by the Leathers Court. We believe it ________ falls, for Article 4 does not target Showcase either as a speaker or as a business. By its terms, Article 4's proscription on activity between 1:00 a.m. and 6:00 a.m. applies to a myriad of other First Amendment speakers, such as persons who from time to time may hold licenses for concerts, dances, or plays. And, moreover, First Amendment speakers are not the only businesses prohibited from late-night operation in Dedham; there is substantial evidence in the record to support the town's contention that the disputed by-law is simply the latest in a progression of by-laws designed to ensure that commercial activities do not impinge unduly on private, residential life.7 In this respect, Article 4 is more akin to the tax in Leathers an impost that the Court ________ upheld because it was an extension of a generally applicable tax, 499 U.S. at 447 than to the tax in Minneapolis Star an impost ________________  ____________________ 7For example, section 42 of the town's revised by-laws, as amended in 1976, prohibits individuals from selling food at retail between 12:00 midnight and 6:00 a.m. Section 42A, added to the by-laws in 1976 and thereafter revised slightly in 1979, proscribes the sale of virtually all retail commodities except fuel products between 12:00 midnight and 6:00 a.m. Dedham also has adopted a by-law forbidding the illumination of signs for retail establishments during the same six-hour interval. 18 that the Court struck down because it was "without parallel in the State's tax scheme," 460 U.S. at 582. To cinch matters, appellant's targeting argument also flies in the teeth of the secondary effects doctrine. Under appellant's formulation, any regulation that has an effect on fewer than all First Amendment speakers or messages could be deemed to be a form of targeting and thus subjected to strict scrutiny. Yet the Supreme Court has recognized that a municipality lawfully may enact a regulation that "serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others." Ward, 491 U.S. at 791. ____ Even appellant's most vaunted precedent does not support its targeting argument. In Minneapolis Star, the Court ________________ did not condemn all regulations that single out First Amendment speakers for differential treatment; rather, the Court acknowledged that certain forms of differential treatment may be "justified by some special characteristic" of the regulated speaker. 460 U.S. at 585. Secondary effects can comprise a special characteristic of a particular speaker or group of speakers. Accordingly, the language we have quoted from Minneapolis Star comfortably accommodates an exception to the _________________ prohibition on differential treatment for regulations aimed at secondary effects, so long as the disparity is reasonably related 19 to a legitimate governmental interest.8 In sum, appellant's targeting argument, like its argument about content quality, fails to furnish a cognizable basis for invoking strict scrutiny. We, therefore, apply an intermediate level of scrutiny in considering the constitutionality of Article 4. C. Applying Intermediate Scrutiny. C. Applying Intermediate Scrutiny. ______________________________ Strict scrutiny aside, restrictions on the time, place, and manner of protected expression and Article 4 plainly qualifies as such a restriction should be upheld so long as they are content neutral, closely tailored to serve a significant governmental interest, and allow for reasonable alternative channels of communication. See Renton, 475 U.S. at 50; Clark, ___ ______ _____ 468 U.S. at 293. Appellant says that Article 4 fails to satisfy any of these three criteria. We do not agree. 1. Governmental Interest. Dedham maintains that the 1. Governmental Interest. _____________________ voters enacted Article 4 to "preserve peace and tranquility for Town citizens during the late evening hours." Such an interest, in the abstract, suffices to justify a content-neutral  ____________________ 8Appellant's continued insistence that Article 4 unlawfully targets Showcase because it was conceived in response to complaints about disruptions incident to the midnight movies reflects a distorted view both of the secondary effects doctrine and of how a representative democracy functions. An ordinance is not called into constitutional question because its enactment is prompted by non-speech-related concerns (e.g., crime, traffic, ____ noise) stemming from the activity of a specific entity. So here: it works no constitutional insult that the community's concerns about the midnight movies acted as a catalyst that spurred the passage of a generally applicable regulation. 20 restriction on protected speech (so long as other requirements are met). No less an authority than the Supreme Court has observed that government's "interest in protecting the well- being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." Carey, 447 U.S. _____ at 471. Appellant concedes the theoretical validity of the town's interest in preserving peace and tranquility, but insists that the record evinces a genuine question as to whether Dedham's articulated concerns, such as noise, crime, and litter, are founded in fact. Going a step further, appellant also contends that Dedham's asserted interest is pretextual, and that a race- based animus, instead of a desire to promote serenity, motivated the adoption of the by-law. The record fails to bear out either of these claims. a. a. __ As an initial matter, appellant asserts that Dedham's professed governmental interest is not substantial because exhibiting midnight movies did not adversely affect the peacefulness of the community, and, therefore, the secondary effects at which Article 4 is aimed are illusory. We agree with appellant's premise: a governmental interest woven exclusively out of the gossamer threads of speculation and surmise cannot be termed substantial. However, we disavow appellant's conclusion: the record before us consists of sturdier stuff and tells a story that strongly supports Dedham's stated purpose. We canvass 21 certain key pieces of evidence. Before Article 4 was more than a gleam in its sponsors' eyes, numerous citizens had complained about vandalism, trespassing, noise, and late-night traffic through residential neighborhoods (with accompanying disruption from headlight glare). On January 19, 1989, Selectman Hoell emphasized at a selectmen's meeting "his concern and the concern of the neighbors in the area of the Cinema regarding incidents at the Cinema during and after the late showings on weekends." At the same meeting, Selectman Kehoe noted that she had "received calls from residents" complaining about "many incidents" at the site, and the police chief, Dennis Teehan, reported to the selectmen that "[t]here have been numerous incidents happening in the area . . . after the midnight shows let out." At the February 2 selectmen's meeting, several residents, including John Birda, Bob Zieman, and John Howard, complained that appellant's late-night operations resulted in disruptions, such as noise in the vicinity of a nearby bus stop. Additionally, appellant acknowledged in the district court that, between February 2 and April 6, its representatives "met with . . . Dedham residents on five separate occasions," and that, during these meetings, it "proposed and developed plans to alleviate any articulated concerns pertaining to traffic, noise and security at or around the Showcase Cinemas complex." Appellant's Complaint, 10. Appellant then put these plans (including, for example, a beefed-up police presence, added patrols, and a litter-removal program) into effect at its expense 22 thus lending a patina of plausibility to the complaints. Robert Cedrone, chairman of the Poor Farm Committee, a neighborhood alliance, capsulized the situation, describing it in the following terms at the April 24 Town Meeting: [There are] more people coming out of the late show cutting through the neighborhood, cutting through back yards. The elderly people still can't get used to that, even with the extra police protection . . . . The people in this neighborhood got to go to sleep . . . . They're sleeping on eggs out there. Appellant attempts to brush aside these remonstrances. Based on information developed through an in-depth investigation conducted in the course of litigation (and, therefore, well after the fact), it argues that the residents' complaints proved to be phantoms, and that, therefore, Dedham failed to carry its burden of establishing that Article 4 actually serves a substantial governmental interest. In advancing this proposition, appellant in effect argues that a municipality cannot credit complaints and other evidence related to past problems with a particular activity or enterprise unless and until it conducts an independent investigation and corroborates each incident. We do not believe that local legislatures are so constrained. A legislative body can act without first acquiring irrefutable proof. In other words, lawmakers need not bury each piece of described trash before acting to combat litter, or confirm each honking horn before acting to abate noise levels. Instead, a legislative body, acting in furtherance of the public interest, is entitled to rely on whatever evidence it "reasonably 23 believe[s] to be relevant to the problem" at hand. Renton, 475 ______ U.S. 51-52.9 Here, it seems pellucid that, in addressing problems of crime, litter, and noise posed by late-night commercial entertainment activities, Dedham had ample reason to assume that the collocation of factors on display at the Town Meeting recurrent, wide-ranging complaints lodged by residents, constabulary concern with a pattern of incidents reasonably believed to have occurred in connection with the exhibition of midnight movies, and a commonsense realization that the placidity of a residential community will be jeopardized by an activity that regularly draws hundreds of late-night patrons, most in automobiles, who must then depart in the early morning hours  ____________________ 9Appellant reads Renton with an astigmatism bred of self- ______ interest. To be sure, as appellant suggests, the Ninth Circuit initially found the city's stated justifications for the ordinance to be speculative because the city enacted it without the benefit of any studies relating to the city's "particular problems or needs." Renton, 475 U.S. at 50 (citation omitted). ______ But the Supreme Court determined that the Ninth Circuit had "imposed on the city an unnecessarily rigid burden of proof," id., reasoning that "[t]he First Amendment does not require a ___ city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses," id. at 51-52. To the extent it is relevant ___ here, Renton stands for the proposition that a municipality may ______ rely upon the experience of other communities in assessing, and then addressing, particular problems. It neither holds nor suggests that a city is debarred from using its own experiences ____________________ for the same purpose. See Ward, 491 U.S. at 800 (holding that a ___ ____ city's substantial interest in limiting sound volume was satisfactorily "evidenced by the complaints about excessive volume generated by respondent's past concerts"). 24 were relevant to, and probative of, its assessment of the problem.10 Consequently, we reject appellant's contention that Dedham's asserted governmental interest is a phantom. b. b. __ In addition to attacking the credibility of the town's anecdotal evidence, appellant asserts that Article 4's "ulterior purpose is to keep African Americans out of Dedham . . . ." Appellant's Brief at 39. This is a serious charge and we treat it as such. Having scoured the record, we agree with the district court that the allegation stands unproven. In support of the accusation, appellant relies principally upon a survey purporting to demonstrate that the audience composition for Showcase's midnight movies is approximately 80% African-American as contrasted with an audience composition of approximately 30% African-American for other screenings. Appellant buttressed the survey results with the affidavit of the theater manager, Anthony Pungitore, to the effect that midnight movie audiences have been "predominantly" African-American, at least since 1986. The district court articulated an abiding concern about the relevance and validity  ____________________ 10In respect to governmental interest, the material fact is whether Dedham had adequate reason to act upon its stated concerns, not, as appellant would have it, whether Dedham's concerns were well-founded. As to the former, the evidence is overwhelming. Hence, the lower court appropriately granted summary judgment on this issue. 25 of the survey evidence,11 but eventually accepted it arguendo ________ for summary judgment purposes as probative of "the racial mix of Showcase audiences." National Amusements, 846 F. Supp. at 1028. ___________________ Nevertheless, the district court found the record "devoid of evidence that race played a role in the decision to adopt the By- law." Id. We reach the same conclusion. ___ Even accepting appellant's assertion as to the racial composition of the midnight movie audiences, appellant has not linked that fact to the municipal decisionmaking process. That is to say, appellant cites no evidence that any person involved in the passage of Article 4 was aware at that time of the racial ____________ composition of Showcase's audiences. This omission is fatal to a claim of intentional racial discrimination. See Washington v. ___ __________ Davis, 426 U.S. 229, 240 (1976) (elucidating "the basic equal _____ protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose"); Village of Arlington Heights _____________________________ v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265 (1977) ________________________________ (similar; rejecting claim that municipality's zoning decision was racially discriminatory); cf. Personnel Adm'r v. Feeney, 442 U.S. ___ _______________ ______ 256, 279 (1979) (explaining that the requirement of discriminatory purpose "implies that the decisionmaker . . .  ____________________ 11The survey results were tabulated by a market research firm that appellant engaged for several weeks in the summer of 1993 (three years after the Town Meeting enacted Article 4). The surveyors noted theatergoers' races, and asked a representative sampling of midnight movie patrons, of all races, why each individual chose to attend the late show. 26 selected or reaffirmed a particular course of action at least in part `because of,' not merely `in spite of,' its adverse effects upon on an identifiable group"). Appellant labors valiantly to fill this void, citing statements from various selectmen and town meeting members that are, to appellant's way of thinking, code words demonstrating "institutional racism." Appellant's Brief at 41. Typical of these comments are Selectman Kehoe's reference to "these young kids, who don't even live in Dedham," and Selectman Hoell's references to "nice little out-of-towners" and "the undesirable element that's attracted by [Showcase's] activity." But these statements, if viewed in the most cynical light, are at worst ambiguous. Standing alone, they are insufficient to raise an inference of racial animus. The record chronicles the lengthy series of events incident to the town's consideration of Article 4, and does not contain the slightest indication that the race of theatergoers was an issue. To the contrary, all the evidence supports Dedham's assertion that Article 4 was aimed principally at curbing late-night disruptions. Against this backdrop, the snippets that appellant has extracted from the record with near- surgical precision simply do not support an inference of racism on the part of the legislative body. While the summary judgment mantra requires us to draw every reasonable inference in favor of the nonmoving party, inferences, to qualify, must flow rationally from the underlying facts; that is, a suggested inference must ascend to what common 27 sense and human experience indicates is an acceptable level of probability. Cf. Dartmouth Review v. Dartmouth Coll., 889 F.2d ___ ________________ ________________ 13, 16 (1st Cir. 1989). This means, of course, that a court pondering a Rule 56 motion need not embrace inferences that are wildly improbable or that rely on "tenuous insinuation." Mesnick _______ v. General Elec. Co., 950 F.2d 816, 826 (1st Cir. 1991), cert. __________________ _____ denied, 112 S. Ct. 2965 (1992). ______ This principle is dispositive of appellant's claim of racial discrimination. While ambiguous remarks may, under some circumstances, help to illuminate the summary judgment record, such remarks rarely will suffice to conceive an issue of material fact when none otherwise exists.12 As we stated in Mesnick, a _______ court is not under an obligation "to draw unreasonably speculative inferences in mulling whether the plaintiff fulfilled his burden of adducing `specific facts showing that there is a genuine issue for trial.'" Id. (quoting Liberty Lobby, 477 U.S. ___ _____________  ____________________ 12On this point, case law in the age discrimination context is instructive. In that milieu, courts frequently have ruled that ambiguous remarks, without more, are not enough to raise an inference of an employer's discriminatory intent. See, e.g., ___ ____ Thomure v. Phillips Furniture Co., 30 F.3d 1020, 1025 (8th Cir. _______ _______________________ 1994) (employer's suggestion to employee that he "might want to consider retirement" rather than accept a pay cut found not probative of age discrimination); Vega v. Kodak Caribbean, Ltd., ____ _____________________ 3 F.3d 476, 481 (1st Cir. 1993) (supervisor's statement that company sheltered "no sacred cows" insufficient to raise inference of age discrimination); Mesnick, 950 F.2d at 826 _______ (supervisor's comment that he was "sad to lose the youth of the work force" did not, by itself, raise an inference of bias against older employees); Merrick v. Farmers Ins. Group, 892 F.2d _______ __________________ 1434, 1438-39 (9th Cir. 1990) (affirming summary judgment for employer despite supervisor's comment that he chose plaintiff's replacement because the latter was "a bright, intelligent, knowledgeable young man"). 28 at 256). It follows that, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz, 896 F.2d at 8; see also Manego v. ____________ ___ ____ ______ Cape Cod Five Cents Sav. Bank, 692 F.2d 174, 177 (1st Cir. 1982) _____________________________ (recognizing that, at the summary judgment stage, "smoke alone is not enough to force the defendants to a trial to prove that their actions were not [racially] discriminatory"; a plaintiff must at least identify "some glowing embers"). So here: asking a court to infer, based on nothing more than the uncommunicated existence of a predominantly African-American theater audience and a handful of arguably ambiguous statements, that a deliberative body of several hundred members acted out of a race-based animus in passing a facially neutral law is simply too much of a stretch. Because courts occupy a special place in our democracy, they must be especially careful not to succumb to the merchants of conjecture. Consequently, they must deal in facts as opposed to suspicions, and in plausible inferences as opposed to speculative suppositions. Fidelity to this ideal constrains us to rebuff appellant's postulatory claim that racial animosity paved the way for Article 4's passage. The record reflects no trialworthy dispute on this issue. 2. Narrow Tailoring. Appellant complains that Article 2. Narrow Tailoring. ________________ 4 is not narrowly tailored because it affects all licensed ___ 29 entertainment, irrespective of any individualized impact on crime, noise, traffic, or trash. The irony of this position is not lost upon us: appellant seemingly demands in this breath that Article 4 be limited to Showcase Cinemas because the relevant secondary effects have been linked predominantly to that entity, yet in an earlier breath denounced such a focus as impermissible targeting, see supra Part III(B)(2). We reject ___ _____ this anfractuous effort to trap Dedham between the Scylla of narrow tailoring and the Charybdis of targeting. In Ward, the Court explained that the narrow tailoring ____ requirement does not mandate a least restrictive means analysis; "[r]ather, the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Ward, 491 U.S. at 799 (internal quotation omitted). ____ Article 4 meets that test: it promotes the substantial government interest of preserving tranquility an interest that, as Dedham's past experience demonstrates, would not be achieved as effectively absent the regulation. Nor is the regulation rendered infirm by its general applicability to all licensed entertainment. It is within a legislature's legitimate purview to conclude that such secondary effects as late-night noise and traffic are likely to adhere to all commercial entertainment. ___ Indeed, the very existence of a licensing scheme, with its built- in emphasis on commercial amusements, supports Dedham's decision to enact a generally applicable regulation. See, e.g., Fantasy ___ ____ _______ 30 Book Shop, 652 F.2d at 1121 n.6 (explaining that a legislature __________ may regulate licensed entertainment based on a reasonable likelihood that patrons would create "excessive noise" or engage in "disruptive or illegal conduct"). 3. Alternate Avenues of Communication. Appellant's 3. Alternate Avenues of Communication. ___________________________________ contention that Article 4 is invalid because it does not allow for "ample alternative channels for communication of the information," Clark, 468 U.S. at 293, need not detain us. The _____ record conclusively demonstrates that adequate alternatives exist allowing appellant to communicate, and audiences to receive, the message contained in the midnight movies. The ban on licensed entertainment affects only five hours out of each 24-hour day, leaving appellant 19 hours (or roughly 80% of each day) in which to communicate its cinematic message. Indeed, the very same films that can no longer be exhibited between 1:00 a.m. and 6:00 a.m. will still be shown an average of six times a day on Fridays and Saturdays, and will be exhibited for roughly 13 hours a day on the other five days of the week. Appellant readily acknowledges the frequency of its exhibitions, but nonetheless argues that the ban on midnight movies forecloses the opportunity to communicate its message to a distinct segment of the movie-going public. To bolster this argument, it again retreats to its survey. The survey results indicate that, out of a random sampling of midnight moviegoers, 14% said that they attended late shows because they "had to work late, and could only come to a late show," and 11% "felt that the 31 midnight show was the only entertainment option open to him/her." From these somewhat inscrutable results, appellant's market research firm concluded that: The late [midnight] show is the only opportunity that the Theater has to exhibit films in order to communicate with a distinct portion of its patrons. Showing films earlier in the day is not a viable means of communication with this segment, because, as indicated by the survey results, these patrons are extremely unlikely and/or unable to attend earlier shows. There are a slew of problems with appellant's analysis. First, the survey is not particularly informative because it focuses on the patrons' options on one particular night.13 __________________________ Thus, patrons who identified the midnight movies as their "only entertainment option" or who said they "could only come to a late show" may well have been confining their answers to one specific evening. Questions of more general applicability were conspicuously lacking. Hence, the wording of the survey defeats appellant's attempted reliance on it. Second, it is reasonable to assume that midnight movies are commercially successful because some people prefer to attend ______ them. Yet, thwarting such an idiosyncratic preference cannot be equated with a denial of adequate avenues of communication. Although Article 4 diminishes the total quantity of appellant's speech in some measure, and simultaneously curtails its  ____________________ 13For example, Question No. 2 asked: "Why did you come to the `Midnight Show' tonight?" (emphasis supplied). Similarly, _______ Question No. 3 asked: "If you couldn't get into the movies tonight, what other entertainment options would you have?" _______ (emphasis supplied). 32 opportunity to communicate with some patrons, those are necessary side effects of almost any restriction on speech. As long as restrictions are content-neutral, some diminution in the overall quantity of speech will be tolerated. See, e.g., City Council of ___ ____ _______________ Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 803, 812 ____________ ______________________ (1984) (finding ample alternative avenues of communication despite assumption that the ordinance "diminishe[d] the total quantity" of appellees' speech). In short, the lens of inquiry must focus not on whether a degree of curtailment exists, but on whether the remaining communicative avenues are adequate. As the Court phrased it: "That the city's limitations on volume may reduce to some degree the potential audience for respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate." Ward, 491 U.S. at 802. ____ Given 19 hours a day within which to exhibit movies, with no special limitations on content, appellant's evidence does not call into legitimate question the adequacy of the alternate routes for communication. D. Recapitulation. D. Recapitulation. ______________ To recapitulate, Dedham has demonstrated, in conformity with the protocol of Rule 56, that Article 4 escapes strict scrutiny. Dedham has also demonstrated that Article 4 survives the lesser degree of scrutiny that obtains here. The municipal by-law is designed to serve a substantial governmental interest, it is narrowly tailored in the service of that interest, and it 33 leaves open ample avenues of communication. Therefore, the district court did not err in granting brevis disposition on ______ appellant's ingenious collection of First Amendment initiatives. IV. MISCELLANEOUS CLAIMS IV. MISCELLANEOUS CLAIMS Appellant makes several additional claims, one under the Due Process Clause of the United States Constitution, one intimating, albeit somewhat obliquely, that Article 4 places an unconstitutional condition on appellant's entertainment license, one involving overbreadth, and the last under Article 16 of the Declaration of Rights contained in the Massachusetts Constitution. These claims lack force.14 A. The Due Process Claim. A. The Due Process Claim. _____________________ Appellant maintains that Dedham did not afford it procedural due process in adopting Article 4. Its rhetoric rings hollow. As an initial matter, we doubt that the concept of procedural due process is applicable in respect to the legislative enactment of a generally applicable statute or ordinance. After all, procedural due process is a doctrine most closely associated with assuring fairness in regard to the  ____________________ 14Appellant also hints at a claim under the Takings Clause, presumably on the theory that Dedham took its "valuable interests in exhibiting midnight movies" without just compensation. Appellant's Brief at 45. We do not probe the point for appellant, by devoting a mere two sentences to the possibility in its briefs, waived any such claim. See, e.g., Ryan v. Royal Ins. ___ ____ ____ __________ Co., 916 F.2d 731, 734 (1st Cir. 1990) ("It is settled in this ___ circuit that issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned."). 34 enforcement of laws or the administration of programs. In general, then, the doctrine bears no relation to the initial enactment of a law. See Laurence H. Tribe, American ___ ________ Constitutional Law 664 (2d ed. 1988). Indeed, the prospect of a ___________________ legislative body being required to afford a panoply of protections for all persons who might arguably be affected by a forthcoming statute or ordinance would seem to be a prescription for parliamentary paralysis. In reaching this conclusion, we follow guideposts erected by the Supreme Court. We find particularly instructive the Court's opinion in Bi-Metallic Inv. Co. v. State Bd. of _____________________ _____________ Equalization, 239 U.S. 441 (1915), a case that arose after the ____________ Colorado Board of Equalization promulgated a county-wide increase in property valuations for tax purposes. The petitioner there adopted much the same position that appellant advocates here. Thus, the Court had to decide "whether all individuals have a constitutional right to be heard before a matter can be decided in which all are equally concerned." Id. at 445. Justice ___ Holmes, writing for a unanimous Court, after noting that it was "hard to believe that the proposition was seriously made," id., ___ rejected the due process requirement hawked by the petitioner: Where a rule of conduct applies to more than a few people it is impracticable that everyone should have a direct voice in its adoption. . . . General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, 35 over those who make the rule. Id. In language that we find appropriate to our case, Justice ___ Holmes concluded: "There must be a limit to individual argument in such matters if government is to go on." Id. ___ Appellant simply ignores this line of authority. It concentrates instead on the fact that the by-law curtailed its licensed exhibition of films, and tries to argue that the curtailment entitled it to the same due process guarantees as would have obtained had Dedham revoked its entertainment license altogether. This is an exercise in sophism that fails for at least two reasons. In the first place, the by-law did not constitute a revocation of the license. In the second place, the record makes manifest that the town afforded appellant both notice and an opportunity to be heard. Appellant cites Derby Refining Co. v. Board of ____________________ _________ Aldermen, 555 N.E.2d 584 (Mass. 1990), for the proposition that ________ Dedham could not lawfully enact Article 4 without first according it a full-scale adjudicatory hearing. Appellant misreads the opinion. In Derby Refining, the state court held that certain ______________ types of licenses, once issued, "become[] a vested property right of the licensee, and may be revoked only when due process protections are complied with." Id. at 722. Assuming for the ___ sake of argument that appellant has a cognizable property interest in its license to exhibit motion pictures, but cf. ___ ___ Roslindale Motor Sales, Inc. v. Police Comm'r, 538 N.E.2d 312, _____________________________ ______________ 314-15 (Mass. 1989) (holding that motor vehicle dealer did not 36 have a property interest in license to deal in used cars), Derby _____ Refining is nonetheless inapposite because the enactment of ________ Article 4 cannot be considered a revocation of that license. __________ Unlike the revocation of a license which results in the total cessation of previously authorized activities Article 4 does not snatch away appellant's right to conduct the authorized activities, but merely cuts back the hours during which those activities may be undertaken. The entertainment license remains intact. Appellant's argument also founders because, in this instance, the town afforded process equivalent to that which would have been due at a revocation hearing. The Town Meeting originally passed Article 40, Article 4's progenitor, in the spring of 1989. Before putting Article 40 to a vote, town officials contacted appellant to discuss the residents' concerns. Various meetings were held. On April 10, Pungitore, the theater manager, attended the Town Meeting and was given an opportunity to speak. The desirability of the ban was reconsidered by the Town Meeting on April 24 for the express purpose of "hear[ing] the proponents and opponents of [the by-law]," and to "give a fair chance to the businessmen of the community to put their side of the story forward." During the ensuing debate, Towey, a senior officer of National Amusements, spoke at considerable length against the proposal. Later, after the Attorney General sidetracked Article 40, appellant received much the same sort of process in respect to Article 4. For example, Towey attended the 37 November 6, 1989 Town Meeting at which Article 4 was put to a vote, participated fully in the discourse, and delivered a lengthy speech urging rejection of Article 4. No more is exigible.15 B. The "Unconstitutional Condition" Claim. B. The "Unconstitutional Condition" Claim. ______________________________________ To the extent appellant suggests that Article 4 places an unconstitutional condition on its entertainment license, the suggestion is without merit. The doctrine of unconstitutional conditions bars government from arbitrarily conditioning the grant of a benefit on the surrender of a constitutional right, regardless of the fact that the government appropriately might have refused to grant the benefit at all. See generally Kathleen ___ _________ M. Sullivan, Unconstitutional Conditions, 103 Harv. L. Rev. 1413, ___________________________ 1415 (1989). Not all conditions are prohibited, however; if a condition is germane that is, if the condition is sufficiently related to the benefit then it may validly be imposed. In the final analysis, "the legitimacy of a government proposal depends on the degree of relatedness between the condition on a benefit and the reasons why government may withhold the benefit altogether." Id. at 1457 (footnote omitted); see also Posadas de ___ ___ ____ __________  ____________________ 15Appellant bemoans the lack of particular forensic devices, such as cross-examination. But even in license revocation proceedings proper, such accouterments are not constitutionally required. See, e.g., Chongris v. Board of Appeals, 811 F.2d 36, ___ ____ ________ ________________ 41-42 (1st Cir.) (holding that revocation of building permit without affording applicants an opportunity to cross-question witnesses is not a denial of procedural due process), cert. _____ denied, 483 U.S. 1021 (1987). ______ 38 P.R. Assoc. v. Tourism Co., 478 U.S. 328, 345-46 (1986) ____________ ____________ (upholding Puerto Rico's ban on advertising casino gambling to Puerto Rico residents because "the greater power to completely ban casino gambling necessarily includes the lesser power" to discourage gambling through the prohibition on advertising). "The more germane a condition to a benefit, the more deferential the review; nongermane conditions, in contrast, are suspect." Sullivan, supra, at 1457. _____ In this instance, Article 4 easily satisfies the requirement of germaneness. Dedham's power to license entertainment as a means of protecting public health and welfare is closely related to the core purpose of Article 4, which, as we have said, is to preserve the nighttime tranquility of the community. Thus, while the ban on licensed entertainment between 1:00 a.m. and 6:00 a.m. may constitute a condition on appellant's license, it is germane and, therefore, not an unconstitutional condition. C. The Overbreadth Claim. C. The Overbreadth Claim. _____________________ Appellant attempts to recast its "narrow tailoring" argument, see supra Part III(C)(2), as an overbreadth attack. It ___ _____ charges that Article 4 is overbroad because it curtails all ___ licensed entertainment, including entertainment that does not produce unwelcome secondary effects. The challenge is baseless. To be sure, appellant attempts to assert the rights of others, but neither standing nor principles of jus tertii pose an ___ ______ insuperable obstacle. First Amendment overbreadth doctrine 39 permits "an individual whose own speech or conduct may be prohibited . . . to challenge a statute on its face because it also threatens others not before the court those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." Board of Airport Comm'rs v. _________________________ Jews for Jesus, Inc., 482 U.S. 569, 574 (1987) (internal _______________________ quotation omitted). The Supreme Court has limited the sweep of the overbreadth doctrine by imposing "[t]he requirement that the overbreadth be substantial." Id.; see also Broadrick v. ___ ___ ____ _________ Oklahoma, 413 U.S. 601, 615 (1973). Consequently, a "facial" ________ overbreadth challenge will not succeed unless "there [is] a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court . . . ." Taxpayers for Vincent, 466 U.S. at ______________________ 801. Here, appellant has failed to demonstrate that Article 4 is overbroad, let alone substantially so. Dedham's preoccupation with licensed entertainment bears a rational relationship to its stated interests, see supra Part III(B)(1), ___ _____ and appellant has cited no examples of other licensees who have been harmed by the by-law despite the absence of secondary effects. That ends the matter. Although Dedham likely would have created overbreadth concerns had it attempted to ban all ___ First Amendment activity between 1:00 a.m. and 6:00 a.m., cf. ___ Jews For Jesus, 482 U.S. at 570-71, it did not take so bold a _______________ 40 step. Rather, Dedham chose a safer path by focusing on those activities commercial entertainment most likely to result in late-night disruptions. The claim of invalidity must, therefore, perish. D. The State Constitutional Claim. D. The State Constitutional Claim. ______________________________ Appellant's complaint contained a claim that Dedham's by-law violated the Massachusetts Constitution. In granting summary judgment, the district court finessed the merits of the state constitutional claim. The court noted that, in presenting its arguments, appellant had not drawn any distinction between the federal and state constitutional claims,16 and ruled, therefore, that appellant had forfeited any chance to argue that the Massachusetts Declaration of Rights offers broader freedom- of-speech protection than the cognate provisions of the First Amendment. See National Amusements, 846 F. Supp. at 1032 n.12. ___ ___________________ On appeal, appellant concedes that it treated the two constitutional provisions identically in the court below, and tells us that it did so in the belief that the federal and state constitutional protections for freedom of speech were coextensive as applied to the exhibition of motion pictures. Having had second thoughts in light of the district court's holding that the by-law does not offend the First Amendment, appellant invites us  ____________________ 16Despite the fact that Dedham moved for summary judgment on all claims, appellant relied almost entirely on federal precedents in opposing the motion. Indeed, appellant only mentioned Article 16 once in its memorandum in opposition to summary judgment, citing it for the uncontroversial point that movies are a form of protected expression. 41 to consider the omitted argument. We decline the invitation. The short of it is that appellant's change of heart comes too late. "It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal." McCoy v. Massachusetts Inst. of Technology, 950 _____ _________________________________ F.2d 13, 22 (1st Cir. 1991) (collecting cases), cert. denied, 112 _____ ______ S. Ct. 1939 (1992). We see no reason to depart from this prudential rule in the circumstances at bar. Given the way in which appellant elected to present its case below, Judge Young acted appropriately in assuming, for purposes of his decision, that the freedom-of-speech protections found in the two constitutions were coterminous. Hence, the disputed ruling must be upheld. See Mesnick, 950 F.2d at 829 n.11 (holding that a ___ _______ plaintiff whose complaint contained parallel claims under federal and state antidiscrimination statutes, but who relied exclusively on federal precedent in unsuccessfully opposing summary judgment, could not argue on appeal that state law was more favorably disposed to his claims). V. CONCLUSION V. CONCLUSION We need go no further.17 For the reasons discussed above, we hold that Dedham's by-law, prohibiting the exhibition of motion pictures at the town's only theater between the hours of 1:00 a.m. and 6:00 a.m., passes First Amendment muster. In the bargain, it also survives appellant's other challenges.  ____________________ 17To the extent appellant has raised or alluded to other grounds for appeal, we reject them by this reference. None requires comment. 42 Accordingly, the order of the district court granting summary judgment in the town's favor must be Affirmed. ________ 43